[Civ. Nos. 8536, 8823.   Fourth Dist., Div. One.   Oct. 16, 1968.]

CITY BANK OF SAN DIEGO, Plaintiff and Appellant, v. GELERT R. RAMAGE, JR., et al., Defendants and Appellants.

572

James C. Monroe and Michael Samuels for Defendants and Appellants.

Procopio, Cory, Hargreaves & Savitch and Gerald E. Olson for Plaintiff and Appellant.

WHELAN, J. — Defendants Gelert R. Ramage, Jr., (Ramage) and Nancy Ramage (Mrs. Ramage) appeal from a judgment taken against them by default on August 19, 1966, which in part decreed the foreclosure of a trust deed (August 19 judgment) and from a judgment dated March 1, 1967 (March 1 judgment), fixing the amount of a deficiency judgment in a hearing under Code of Civil Procedure, section 726, following the foreclosure sale.

Defendant Lowell Orgill Kirk (Kirk) appeals from the August 19 judgment which awarded a recovery against him.

Plaintiff City Bank of San Diego (Bank) appeals from the March 1 judgment.

Ramage and Mrs. Ramage base their appeal upon the following grounds:

1. Error of the court in denying their motion to set aside their defaults.

2. Error of the court in the admission of evidence in the hearing leading up to the default judgment, and, as a result thereof, in basing its judgment on insufficient evidence.

3. Error of the court in decreeing a foreclosure and in the same judgment of August 19 awarding a personal judgment against them for the amount secured by the trust deed foreclosed.

4. Error of the court in the March 1 judgment in fixing the amount necessary to redeem from the foreclosure sale; and in fixing the amount of the deficiency judgment.

5. Error of the court in excluding evidence in the hearing leading up to the March 1 judgment.

Kirk's appeal also claims error in the denial of the motion to set aside the defaults and in awarding two kinds of relief in the August 19 judgment, i.e., a personal judgment, and a decree of foreclosure.

Bank's appeal is based upon alleged insufficiency of the evidence as to the amount of the deficiency fixed in the March 1 judgment.

PROCEDURAL BACKGROUND

Bank on June 4, 1965, filed its action against Ramage and Mrs. Ramage. It alleged that it had lent $150,000 to the Ramages for which they gave a note secured by trust deed on San Diego County property; that the loan had been made upon certain false representations made by the Ramages knowingly with intent to induce action; the prayer was for rescission but with retention of the security of the trust deed to protect Bank against intervening claims against the Ramages and the real property.

The Ramages responded in a joint answer prepared by their present counsel, who has represented them throughout, and also has represented Kirk since his first appearance in the action.

The answer of the Ramages to the original complaint admitted "they borrowed the sum of One Hundred Fifty Thou-

sand Dollars''; denied the execution of the note and trust deed.

Bank filed an amended complaint on January 4, 1966, joining Kirk and others as additional defendants in two of the three causes of action. The first cause of action for rescission iterated the allegations of fraud against the Ramages and alleged Kirk to have been a party to the fraud; the second cause of action was in implied *assumpsit* for the amount allegedly paid out to the Ramages, Kirk, and others, as the result of fraud and deceit practised upon plaintiff, the exact nature of which was not alleged, nor were the allegations of specific fraud found in the first cause of action incorporated in the second; the third cause of action was to foreclose the trust deed for amounts provided for in the note, which included attorney's fees; the relief sought under the third cause of action was stated to be as an alternative to rescission.

The amended complaint was served on the Ramages on January 4, 1966 by mailing it to their attorney of record.

Kirk was served personally with the amended complaint in Orange County on January 7, 1966.

The defaults of the Ramages and Kirk were entered on March 25, 1966. Notice to that effect dated March 28 was mailed to Monroe.

Notice of motion to vacate defaults as to the Ramages and Kirk was filed May 6. It was accompanied by a proposed answer bearing the typewritten date April 28, 1966.

The proposed answer among other matters denied the Ramages had borrowed $150,000 as alleged in the amended complaint.

The motion to set aside the defaults was heard and denied on May 26, 1966.

A trial by default was had at which 18 documents were received in evidence, and two witnesses testified. Judgment was rendered in favor of Bank on August 19, 1966.

The judgment contained a finding that the note and deed of trust had been accepted by Bank as the result of fraud practised by the Ramages and Kirk; it then decreed the foreclosure of the trust deed for the amounts adjudged to be due, including $12,500 attorney's fees as provided in the note and trust deed; the total amount, in satisfaction of which sale of the property was decreed, was $175,122.22; the Ramages were adjudged personally liable therefor.

The proceeds of the sale were ordered to be applied in payment of the various items of the judgment in the following

order: (1) interest accrued since judgment; (2) costs of suit; (3) attorney's fees; (4) trustee's fees; thereafter on interest and principal.

There was a provision as follows: "The amount of the judgment on plaintiff's second cause of action shall be credited in the same amount and to the same extent that said interest after judgment and costs of suit of $417.00, and interest of $20,702.00, and principal of $140,005.48, are credited by reason of any application of sale proceeds."

The judgment next provided that in the second cause of action of the amended complaint Bank recover from the Ramages, Kirk and another defendant the sum of $140,005.48 with interest and costs.

The judgment then provided "that the amount of any recovery on the judgment on plaintiff's second cause of action shall constitute a credit in a like amount on the judgment on plaintiff's third cause of action."

### MOTION TO SET ASIDE DEFAULTS

The declarations under penalty of perjury in support of and in opposition to the motion to set aside default show the following:

On February 15, 1966, Bank's attorney, Olson, wrote the Ramages' attorney, Monroe, calling the latter's attention to the fact that an answer was overdue. No response was made to the letter.

On February 28, Olson again wrote Monroe about the overdue answer, stating that the defaults of the Ramages would be taken unless they responded to the amended complaint on or before March 7.

On April 4, 1966, Monroe signed a letter to Olson in which he said, in part:

"Needless to say, I was quite shocked to find your Notice of Entry of Default upon my return to the office. My distinct recollection was that in response to a request by me, occasioned by the prevalent flu in the office, the time was extended.

"Thereupon, I dictated the Answer and had the verification signed and thereafter retyped and apparently my then secretary failed to file the same and send it on to you.

"During the last week I have been almost continuously absent from the office and much of the time from the state.

"Accordingly, request is hereby made that the default be set aside and that you raise no objection to our filing the enclosed Answer. . . .

"As you well know, both Dr. and Mrs. Ramage have denied under oath that they have affixed their signatures to the note or to the trust deed. . . ."

The "enclosed answer" referred to bore the typewritten date "April 4, 1966."

Monroe's declaration under penalty of perjury dated April 29, 1966, accompanied the notice of motion to set aside the defaults. In part it stated:

"That during the early part of March, 1966, your declarant was absent from his office on many occasions by reason of the flu, which was epidemic in proportions in this area at that time, and also was extremely handicapped in that his secretarial and receptionist help would be absent also and that even when your declarant was present, he had an exceptionally heavy case load and was totally unable to attend to the matters within the office during this period being obliged to conduct what court appearances procedurally. [*sic*]

"Additionally, during the period of time covered between the date of notice of the entry of default, to wit: the 28th March, 1966, and the time when your declarant was absent from the office by reason of illness, your declarant was engaged in trial and in the conduct of extensive negotiations in the city of Denver, State of Colorado, and was absent from the state by reason of such negotiation of business.

"That upon receipt of notice that a default had been entered your declarant contacted the said GERALD E. OLSON and expressed shock and concern in view of the courtesies extended and advised the said GERALD E. OLSON that, in a conversation with him on the telephone, sometime between the 28th day of February, 1966, and the 4th or 5th day of March, 1966, in which your declarant advised the said GERALD E. OLSON that illness has decimated his office; that he had received and understood that he had received an extension of time in an amount such as would be necessary in which to file an answer on behalf of the defendants Ramage and on behalf of the new defendant, LOWELL KIRK; and that it was upon reliance of this that an answer had not been immediately filed."

As noted, the proposed answer accompanying the notice of motion bore the typewritten date "April 28, 1966." In substance it is the same as the answer dated "April 4, 1966" which accompanied Monroe's letter of that date, but in such matters as spacing and signature the two answers differ.

Monroe filed a supplemental declaration under penalty of perjury dated May 14, 1966. It contained, among other material, the following:

"That at no time was any question raised as to the debt owed by RAMAGE, although it was not known whether NANCY RAMAGE had signed any of the papers or instruments involved and moreover, it was at all times the position of RAMAGE that he had not signed the escrow papers involved.

"   .   .   .   .   .   .   .   .   .   .   .

"The deposition of DR. RAMAGE, taken *November 22, 1965,* disclosed that he had signed the subject note and Trust Deed January 8, 1964, although it did not contain a legal land description at the time, and that he did sign a letter dated January 23, 1965, addressed to the BANK (plaintiff); that the purported signatures of NANCY RAMAGE were in fact forged; that he had never had any contact with Plaintiff BANK or its officers prior to affixing his signature as set out above.

"   .   .   .   .   .   .   .   .   .   .   .

"That in the latter part of January, 1965 [*sic*], declarant had prepared a detailed answer on behalf of the RAMAGES and KIRK, had the same verified, had dictated and caused to be typed covering letters to the County Clerk and to plaintiff's counsel, and had envelopes prepared and a check written for additional answering fees occasioned by the first appearance of KIRK.

"   .   .   .   .   .   .   .   .   .   .   .

"Your DECLARANT had a telephone conversation with GERALD E. OLSON on or about March 10th, 1966, advising him of his illness and office situation and discovering that the answer had not been mailed.

"   .   .   .   .   .   .   .   .   .   .   .

"That your DECLARANT verily believed that by reason of the above set out conversation, he had been given unlimited time to file an answer so long as the pretrial date was not disturbed."

For the purpose of showing that Olson should have known that Monroe would represent Kirk as well as the Ramages, Monroe, in the May 14 declaration, stated: "[t]hat GERALD E. OLSON was advised by your declarant and well knew that all interests of the RAMAGES in the OCEANSIDE PROPERTY (the subject of this law suit) was acquired by LOWELL KIRK and that KIRK was to undertake to meet all obligations of the RAMAGES in the premises as a part of their association (Crescent Medical Group) severance agreement."

He also mentioned an earlier legal action taken by Bank against Ramages on a note for $5,000 purportedly signed by Ramage, but which it may be inferred Kirk had signed Ramage's name to and had later paid off. In fact, the payment was made by or through Monroe; a letter from him dated July 11, 1964, enclosing payment does not disclose the source of the funds and states: "The receipt for the above sums should be made to the undersigned, for reasons which are better understood than set out." All of that had occurred nearly six months before commencement of the action in which this appeal has been taken.

Olson filed on May 10, 1966, under penalty of perjury, a declaration in opposition to the motion to set aside defaults in which he stated:

"The only discussion which I have had with Attorney Monroe concerning the entry of defaults against the Ramages was on Tuesday, March 8, 1966. Mr. Monroe telephoned me and advised that, in response to my letter of February 28, 1966, Exhibit B hereto, he had been ill with the flu and that his secretary had failed during his absence from the office to mail the answer which he had previously prepared. He further stated that the answer was ready, would be mailed immediately, and would be in my hands no later than Friday, March 11, 1966. I advised Mr. Monroe that I would expect to receive the answer no later than March 11th."

A motion for relief under Code of Civil Procedure, section 473, is addressed to the sound discretion of the trial court, and in the absence of a clear showing of abuse thereof the exercise of that discretion will not be disturbed on appeal. (*Coyne* v. *Krempels*, 36 Cal.2d 257, 263 [223 P.2d 244]; see also *Gudarov* v. *Hadjieff*, 38 Cal.2d 412, 418 [240 P.2d 621].)

In the case at bench, the showing made in support of the motion under section 473, Code of Civil Procedure, was loaded with inconsistencies as to the alleged facts and time relationships; was vague and uncertain as to the times of the alleged illnesses of defendants' counsel and his office staff; and in material matters was controverted by the declaration of Bank's counsel: "[W]hen there is substantial conflict in the facts presented by affidavits, the determination of the controverted facts by the trial court will not be disturbed on appeal." (*Daniels* v. *Pitman*, 123 Cal.App.2d 345, 347 [266 P.2d 820].) (See also *Coyne* v. *Krempels, supra,* 36 Cal.2d 257, 263.)

The evidence presented by defendants falls short of show-

ing that they were entitled to relief as a matter of law. (*Gudarov* v. *Hadjieff, supra,* 38 Cal.2d 412, 417; *Doyle* v. *Rice Ranch Oil Co.,* 28 Cal.App.2d 18, 19 [81 P.2d 980].)

Upon the evidence before it, the trial court did not abuse its discretion in denying the motion to set aside the defaults.[1]

SHOULD THE TRIAL COURT HAVE HELD THAT THE ANSWER TO THE ORIGINAL COMPLAINT SHOULD STAND AS AN ANSWER TO THE AMENDED COMPLAINT?

In their closing brief on appeal, Ramages, for the first time, raise the issue that their answer to the original complaint was sufficient to stand as their answer to the amended complaint; that, therefore, their default should not have been entered; and, having been entered, should have been set aside for that reason if for no other. In support of that position, they cite *Gray* v. *Hall,* 203 Cal. 306 [265 P. 246].

We have discussed in *Bristol Convalescent Hospital* v. *Stone,* 258 Cal.App.2d 848, 861, 862-863 [66 Cal.Rptr. 404], what would be appropriate on the part of a defendant who makes such a claim.

In his supplemental declaration in support of the motion under section 473, Monroe stated: "[t]hat the First Amended Complaint introduces several new defendants including DR. KIRK and two new theories of recovery, viz., (1) money had and received and (2) a pleading in conformance with an amended statute limiting the bar on deficiencies in purchase money trust deeds to dwelling units."

In the reply brief he calls the court's attention to "the great similarity between the 'Complaint for Rescission' filed June 4, 1965 . . . and the First Amended Complaint."

---

[1] In *Orange Empire Nat. Bank* v. *Kirk,* 259 Cal.App.2d 347 [66 Cal. Rptr. 240], a motion to set aside the default taken against Kirk because of Monroe's failure to file a demurrer or answer was granted based upon a showing of Kirk's personal excusable mistake. In that case Kirk consulted other counsel as early as July 1966; the default had been taken in October 1965; judgment was entered March 15, 1966; Kirk was informed by the plaintiff on March 7 that judgment was to be taken against him. In the present case Kirk has not made any affidavits or declarations.

It is not without interest that in the *Orange Empire Bank* case Kirk's declaration spoke of a conversation on April 4, 1966 with Monroe's office manager in which the latter said Monroe was out of town. That is the date of a letter to Olson over Monroe's purported signature and of the proposed answer that accompanied the letter found in the record of this appeal.

It is of interest, too, that Kirk's defense in the *Orange Empire Bank* case was that he had not signed a guaranty over his purported signature; such was Ramage's defense on the $5,000 note bearing his purported signature; such the denials in the answer to the original complaint in the present case.

■ In the present case the Ramages made no such claim in the court below; their counsel's claims there were that he had intended to answer, had thought his time to answer had been extended, and had in fact prepared an answer to the amended complaint on one or more occasions. He did not at any time ask the trial court to pass upon the question whether he was required to answer; the court had no duty in the face of the Ramages' claim they desired leave to answer the amended complaint to initiate *sua sponte* an inquiry into the sufficiency of the original answer to serve as an answer to the amended complaint. For those reasons we do not believe that error can be predicated on the court's refusal to set aside the defaults on that particular ground.

### EVIDENCE AT THE DEFAULT HEARING

At the default hearing a Bank officer, Chasteen, testified that the persons who dealt directly with Bank for the loan of $150,000 were one Simons and one Stephen, who represented themselves as acting for the Ramages. Stephen had and left with Bank a written authorization to Stephen's company purportedly signed by Ramage.

Simons represented that the Ramages were to pay $221,500 for between three and four acres of land in Oceanside upon which 94 apartment units would be built. Of the purchase price of the land for purchase of which an escrow had been opened, $71,500 in cash of their own money would be paid by the Ramages in addition to the proceeds of the loan.

Bank agreed to make the loan. A note and a trust deed were prepared for the signatures of Ramage and his wife and taken away by Stephen and Simons.

Bank opened an independent escrow for payment of the loan proceeds. The note was signed by Ramage and purportedly signed by Mrs. Ramage; so was the trust deed, which bore a notary's certificate of acknowledgment by both the Ramages.

In fact, under its agreement Bank withheld $15,000 to cover the cost of a take-out loan to be obtained elsewhere.

Shortly thereafter, a letter purportedly signed by Ramage was received by Bank, asking release of the $15,000. That request was refused.

On March 23, Simons and a man he introduced as Ramage came to the Bank ard obtained a new loan of $5,000 on a note to which the man introduced as Ramage signed Ramage's name; when that note became due and demand for payment was made, Ramage denied the signature was his.

Chasteen thereafter went to the office of Kirk and recognized Kirk as the man who had signed Ramage's name. Kirk asserted that he had been authorized by Ramage to do so. The check for $5,000 made payable to Ramage was cashed by Simons, who later told Chasteen he had been authorized by Ramage to cash it.

In June 1964, with the $150,000 note to become due in July, Bank wrote to Ramage about it. He responded by a telephone call in which he said he was coming to San Diego and in which he arranged a meeting with Chasteen at a restaurant. At that meeting, Ramage introduced a woman as his wife; they discussed the note of $150,000; neither of them denied the obligation, but Ramage spoke of wanting an extension of the loan. Chasteen made an appointment to meet the Ramages at the Bank the following morning; the Ramages did not appear.

In fact, the transaction for the purchase of the property involved the taking over from three other men of an arrangement to purchase it for $129,000; with an additional $15,000 to go to the three men who gave up their rights, but who permitted the sale to be made to the Ramages with only about $6,000 being paid to them.

Ramage gave his deposition in which he said that after returning from a trip he had been informed by Kirk that he, Ramage, had bought the property in question. He had signed the note and trust deed thereafter. He denied having signed the written authorization to Stephen's company.

### THE SCOPE OF THE RELIEF GRANTED IN THE JUDGMENT OF AUGUST 19

The relief granted by the judgment of August 19 did not exceed that prayed for in the amended complaint.

The Ramages and Kirk contend, however, that Bank is limited to its recovery on the third cause of action for foreclosure because of the provisions of section 726, Code of Civil Procedure.

■ A defendant against whom a default judgment has been taken has a right to appeal from it. (*Gudarov* v. *Hadjieff, supra,* 38 Cal.2d 412; *Nemeth* v. *Trumbull,* 220 Cal.App. 2d 788, 790 [34 Cal.Rptr. 127].)

Generally on such an appeal attack is confined to jurisdictional matters and fundamental pleading defects. (*Nemeth* v. *Trumbull, supra; Reed Orchard Co.* v. *Superior Court,* 19 Cal.App. 648 [128 P. 9, 18]; *Lester* v. *Beer,* 74 Cal.App.2d Supp. 984 [168 P.2d 998].)

■ Evidence must be taken to prove the amount of damages in an action sounding in tort (*Taliaferro* v. *Hoogs,* 219 Cal.App.2d 559, 560 [33 Cal.Rptr. 415]); likewise in an action to recover under a contract where the complaint seeks to recover an amount other than a specified amount set forth in the contract itself, or for breach of a contract that does not express the amount of liquidated damages. (*Lynch* v. *Bencini,* 17 Cal.2d 521, 526-527 [110 P.2d 662].)

### The Effect of Section 726, Code of Civil Procedure

■ Section 726, Code of Civil Procedure, provides in part as follows: "There can be but one form of action for the recovery of any debt, or the enforcement of any right secured by mortgage upon real property, which action must be in accordance with the provisions of this chapter."

The provisions of section 726 are for the benefit of the original debtor. (*Martin* v. *Becker,* 169 Cal. 301 [146 P. 665, Ann. Cas. 1916D 171]; *Murphy* v. *Hellman Commercial etc. Bank,* 43 Cal.App. 579, 583 [185 P. 485].) Its provisions may be waived. (*Martin* v. *Becker, supra; Murphy* v. *Hellman Commercial etc. Bank, supra; Salter* v. *Ulrich,* 22 Cal.2d 263 [138 P.2d 7, 146 A.L.R. 1344].) The provisions of section 726 constitute an affirmative defense which must be pleaded or it is waived. (*Spector* v. *National Pictures Corp.,* 201 Cal. App.2d 217 [20 Cal.Rptr. 307]; *Salter* v. *Ulrich, supra,* 22 Cal.2d 263, 268.)

Kirk, not being the original debtor, is not entitled to the benefit of section 726; the Ramages have waived its benefits, even to the extent of denying in their original answer the execution of the note and trust deed.

Therefore, the question whether the judgment awarded relief in excess of that to which Bank was lawfully entitled must be decided on grounds other than the quoted portion of section 726, Code of Civil Procedure.

### The Amount Necessary to Redeem

In the judgment of March 1, 1967, the court fixed the amount necessary to redeem from the foreclosure sale at $125,000.

■ The actual price paid by Bank at the foreclosure sale was $60,000. The amount necessary to redeem was fixed upon the theory that since the fair market value at the time of sale, as determined by the court for the purpose of fixing the amount of the deficiency judgment, was $125,000, that should

be the amount necessary to redeem rather than the amount for which the property sold.

Had the sale been made to a third person, there would be no significant relationship between those two figures.

Section 702, Code of Civil Procedure, provides in part as follows: ''The judgment debtor, or redemptioner, may redeem the property from the purchaser . . . on paying the purchaser the amount of his purchase . . . and if the purchaser be also a creditor, having a prior lien to that of the redemptioner, other than the judgment under which said purchase was made, the amount of such lien with interest.''

Section 702 also provides a procedure for a determination by the court of the amount necessary to redeem: ''In the event there shall be a disagreement between the purchaser and redemptioner as to whether any sum demanded *by the purchaser is a proper charge* to be added to the amount required for redemption . . .''

The provision of the judgment of March 1, fixing $125,000 as the amount necessary to redeem, was not the result of the statutory procedure under section 702, and it does not appear that any attempt has been made to redeem.

However, we must point out that the amount for which the property was sold is the correct amount for redemption, plus the specific items mentioned in section 702. It cannot be said that Bank is a creditor having a lien ''other than the judgment under which the purchase was made.'' (See *Duff* v. *Randall,* 116 Cal. 226 [48 P. 66, 58 Am.St.Rep. 158].)

The judgment of March 1 must be reversed as to that part of it fixing $125,000 as the amount necessary to redeem.

SUFFICIENCY OF THE EVIDENCE AT THE DEFAULT HEARING TO SUPPORT FINDINGS AND JUDGMENT OF AUGUST 19

The Ramages question the admissibility of the extrajudicial declarations of several persons to prove they acted as agents of the Ramages. Such an objection is based upon the rule against hearsay, since the fact of agency may be established by the testimony of the agent. (*Kast* v. *Miller & Lux,* 159 Cal. 723, 728 [115 P. 932].)

█ Hearsay admitted without objection is evidence that may be considered. (*Merchant etc. Assn.* v. *Kellogg Express etc. Co.,* 28 Cal.2d 594, 599 [170 P.2d 923] ; *Lucy* v. *Davis,* 163 Cal. 611, 616 [126 P. 490].)

THE FINDINGS OF FRAUD

█ Here, as in *Wilson* v. *Walters,* 19 Cal.2d 111, 122 [119 P.2d 340], it cannot be said that plaintiff waived the tort, the

claim based upon fraudulent representations, and relied upon the contract and is thereby foreclosed from asserting that its claim is based on fraud and not discharged in bankuptcy. (See also *Bohn* v. *Watson*, 130 Cal.App.2d 24, 35 [278 P.2d 454].)[2]

''[T]he common-law action for money had and received will lie to recover money obtained by fraud, misrepresentation, duress, undue influence, and mistake of fact.'' (*Firpo* v. *Pacific Mut. Life Ins. Co.*, 80 Cal.App. 122, 125 [251 P. 657].)

Evidence of fraudulent representation is admissible in support of a cause of action for money had and received. (*Firpo* v. *Pacific Mut. Life Ins. Co.*, 80 Cal.App. 122, 125 [251 P. 657].)

*A fortiori*, such evidence might be admitted where the fraudulent acts have been pleaded.

That being so, findings that fraud was practised might properly be made to support a judgment on such a cause of action and are not necessarily superfluous in a judgment based upon the contract.

### Evidence in Support of Finding as to Fair Value of Property on Date of Foreclosure Sale

▮▮▮▮ Bank, as cross-appellant from the March 1 judgment, argues there was no substantial evidence to support the court's finding that the fair value of the property on date of foreclosure sale was $125,000.

One of the Ramages' witnesses testified that the fair market value or fair value as of October 14, 1966, was $200,000; another that such value was $140,000. Each valuation was given without objection and after the witness had been questioned on *voir dire*.

It is argued, however, that cross-examination destroyed the value of the testimony, and that the views of the witnesses as to the factors that entered into fair market value showed the opinions to be of insignificant value.

Bank's criticism, therefore, goes to the weight of the evidence, which the trial judge was qualified to assess.

The Ramages, in their attack upon the evidence in support of that finding on value, cite as error the court's ruling in

---

[2]''Bohn argues that the allegations of fraud and conspiracy were not material or essential to the judgment as rendered and added nothing to it; hence, it is claimed, these allegations were neither admitted by her default nor adjudicated in that judgment. This is a mistaken conception. The root and origin of a liability becomes of extreme importance, to give but one example in determining the effect of any subsequent discharge in bankruptcy of the judgment debtor.'' (p. 35)

excluding (a) testimony as to what the real property, apart from improvement value, would have been worth if purchased for improvement with a 94-unit apartment house building producing certain fixed rents; (b) a chart that had been prepared to show the cost of such improvements when the loan to the Ramages originally was made, the gross yield therefrom, and other factors entering into a net return that permitted a capitalization figure necessary to produce such net return; (c) a graph showing trends in land values in southern California in 1960-1966; (d) an appraisal made by one of the witnesses for Bank at the time the loan was made in January 1964.

The testimony as to value posited upon a capitalization of purely speculative nonexistent income was properly excluded. ▋ In the case of property actually yielding an established regular income, the capitalization of the net income, taking into account the replacement cost of improvements as of the relevant date, is a highly significant index of market value as of that date.

▋ The question of the adaptability of the subject property for a specific use is one of the matters to be considered in arriving at an opinion as to its highest and best use. The profitability of such use measured in terms of specific amounts, and, dependent upon the nature and cost of specific improvements yet to be made, is not admissible evidence on the subject of fair market value. (*People* ex rel. *State Park Com.* v. *Johnson*, 203 Cal.App.2d 712 [22 Cal.Rptr. 149].) Objections to questions intended to bring out such problematical income were properly sustained.

So, too, was the objection to the offer in evidence of a chart intended to make the same kind of showing.

While it was proper to show the witness's knowledge of the existence of the graph showing general increases in real estate values over a period of years, the contents of the graph itself had no probative worth as to the value of the subject property on a given date.

### ELECTION OF REMEDIES

In its original complaint, Bank adopted a theory intended to permit recovery of the amount paid by it, while having the benefit of the security of the real property. (See *Grant* v. *Weatherholt*, 123 Cal.App.2d 34, 49-50 [266 P.2d 185].) That theory was abandoned in seeking and obtaining a decree of foreclosure based upon the amended complaint.

Bank, by obtaining a decree of foreclosure, has affirmed the contract, choosing the alternative to a rescission.

It might at the same time affirm the contract and seek to recover damages for the fraud. (*Paolini* v. *Sulprizio,* 201 Cal. 683 [258 P. 380]; *McCauley* v. *Dennis,* 220 Cal.App.2d 627, 632 [34 Cal.Rptr. 90]; *Boyd* v. *Bevilacqua,* 247 Cal.App.2d 272, 294 [55 Cal.Rptr. 610]; *Harold* v. *Pugh,* 174 Cal.App.2d 603, 610 [345 P.2d 112]; *Finch* v. *McKee,* 18 Cal.App.2d 90, 93 [62 P.2d 1380].)

▊ Instead of seeking damages for the alleged fraud, Bank sought recovery of the full amount it had paid out with interest under an alleged cause of action in *assumpsit* based upon an implied promise to repay money obtained by fraud. Such a cause of action arises only when a contract induced by fraud has been rescinded by the defrauded party. (*Philpott* v. *Superior Court,* 1 Cal.2d 512, 518 [36 P.2d 635, 95 A.L.R. 990].)

▊ A cause of action having its origin in a rescission of the contract is inconsistent with a cause of action for enforcement of the contract based upon its affirmance. (*LeClercq* v. *Michael,* 88 Cal.App.2d 700 [199 P.2d 343]; *Evans* v. *Rancho Royale Hotel Co.,* 114 Cal.App.2d 503 [250 P.2d 283].)

However, the strict application of the doctrine that recovery may not be had on two inconsistent causes of action has been avoided in situations where the inconsistent remedies have been pursued against different persons. There is in fact no double recovery where the defendant affected has allowed default judgment to be taken against him without requiring the plaintiff to make an election, and the pursuit of another remedy against another person has not worked to the prejudice of the defendant in default. (*Heintzsch* v. *LaFrance,* 3 Cal.2d 180, 183-184[3] [44 P.2d 358].)

---

[3]"Defendants also complain that the judgment for the full amount plaintiff sought to recover was rendered against both the agents and the principals, in spite of their motion that plaintiffs be required to elect which to hold." (*Heintzsch* v. *LaFrance,* 3 Cal.2d 180, 183 [44 P.2d 358].)

"But the complaint set forth a cause of action for fraud as well as one based on mistake. By their default, the agents admitted the charge of obtaining money from the plaintiffs by fraudulent representations, and judgment against them was proper on this ground alone. (*Stirnus* v. *Adams,* 50 Cal.App. 730 [195 P. 955]; see also *Lewis* v. *McClure,* 127 Cal. App. 439 [16 P.2d 166].) That this cause of action was not pressed at the trial is of no consequence, so far as the liability of these defaulting defendants is concerned. The judgment against the principals rests upon the sound basis that they received the money under a purported contract which, by reason of failure of mutual assent, was not binding. There is, therefore, no valid objection to the double judgment. (See generally, 14 Cal.Jur. 887, 902.) There cannot, of course, be a double satisfaction thereof." (*Heintzsch* v. *LaFrance,* 3 Cal.2d 180, 184 [44 P.2d 358].)

██ The doctrine of election as applied to a choice of remedies which precludes a party from claiming repugnant rights is but an extension of the general principles of equitable estoppel, and proceeds upon a like theory that the inconsistent actions of the party will put his adversary to some disadvantage (*Mansfield* v. *Pickwick Stages*, 191 Cal. 129, 131 [215 P. 389]; *Crittenden* v. *St. Hill*, 34 Cal.App. 107, 110 [166 P. 1016]; *Pacific Coast Cheese, Inc.* v. *Security-First Nat. Bank*, 45 Cal.2d 75, 80 [286 P.2d 353].)

██ The doctrine of election of remedies, being a form of estoppel, is an affirmative defense that ordinarily must be specially pleaded unless it appears on the face of the complaint. (*Modoc Mineral & Oil Co.* v. *Cal-Vada Drilling etc. Co.*, 236 Cal.App.2d 868, 875 [46 Cal.Rptr. 508].)

The right to have an election of remedies exercised may be waived by the person sought to be bound. (*Bank of America etc. Assn.* v. *Hill*, 9 Cal.2d 495, 500 [71 P.2d 258]; *Klinger* v. *Modesto Fruit Co., Inc.*, 107 Cal.App. 97, 103 [290 P. 127].)

██ Having in mind that in the event of an affirmance of the loan contract by Bank, Kirk would be liable for any loss caused by his fraud, it cannot be said that a judgment against him for such amount would be inequitable, although obtained in a cause of action that did not seek damages as such.[4]

In the case at bench, Bank had a right of action against Kirk based upon fraud in the procurement of the loan. By his default Kirk admitted the allegations of fraud, and his participation in the receipt of the loan proceeds.

There is authority that, in an action for fraud and deceit, the payee of a note may recover judgment for the full amount of the loan from one not the maker of the note, whose fraud has induced the making of the loan without attempting to recover on the note and without regard to what might possibly have been recoverable on the note. (*First State Sav. Bank* v. *Dake*, 250 Mich. 525 [231 N.W. 135]; see also *Harold* v. *Pugh, supra*, 174 Cal.App.2d 603, 610; *Wilkenson* v. *Linnecke*, 251 Cal.App.2d 291, 295 [59 Cal.Rptr. 290].)

In such a case the damages recoverable are the amount lent as consideration for the note. (*First State Sav. Bank* v. *Dake, supra*, 231 N.W. 135.)

---

[4] "[U]nder the well-settled principles of the doctrine of estoppel, the disadvantage here referred to must be a real injury, such as would, in contemplation of law, amount to a fraud upon the party invoking the estoppel. When it is of this character the doctrine of election of remedies will be applied by the courts." (*Mansfield* v. *Pickwick Stages*, 191 Cal. 129, 131 [215 P. 389].)

In *Bohn* v. *Watson, supra,* 130 Cal.App.2d 24, where two causes of action were held to be consistent, judgment for the full amount of a fraudulently induced loan was rendered on one cause of action based on fraud, and for the amount of the note and attorney's fees on a second cause of action on the note;[5] the judgment on one of the two causes of action was said to be ''concurrent'' with the judgment on the other cause of action ''to the extent thereof.''

The method provided by the judgment appealed from of offsetting payments made on the judgment of foreclosure against the judgment on the second cause of action would make Kirk responsible for items of expense to Bank that are not proper items of damages resulting from the fraud.

He is not to be held for such items as attorney's fees that he did not agree to pay. To the extent that the judgment against him indirectly would increase his liability above the amount of damages resulting from the fraud, the judgment must be reversed.

The proper method of offsetting payments made on one judgment against the amount of the other would be to say that the amount of the judgment on the second cause of action should be reduced by any and all amounts credited against the judgment on the third cause of action; conversely, any amounts realized by execution against Kirk should also be applied in reduction of the deficiency judgment on the third cause of action.

The difference between the amount paid for the property at the foreclosure sale and the amount determined by the judgment of March 1, 1967, to have been the fair value of the property on the date of foreclosure sale is not to be considered as an amount credited upon the judgment on the third cause of action.

---

[5]''The complaint alleges two causes of action, the first founded on fraud, as the allegations we have hitherto set out clearly establish, and the second based on a promissory note given as a concomitant of the fraudulent transaction. That the judgment is predicated on fraud patently appears since it decrees that plaintiff recover jointly from Bohn and Natalie Chamberlain the sum of $42,974.09 on plaintiff's *first cause of action,* which alleged the transaction based on the fraud of *both* of these defendants; on the second cause of action, which stated the contract count, recovery is decreed from Bohn *alone* in the above amount, to which is added the sum of $1,029 as attorney's fees as provided in the note. 'Therefore, it cannot be said that the judgment is not predicated on fraud, or that the liability on that basis was abandoned.' '' (*Bohn* v. *Watson,* 130 Cal.App.2d 24, 35 [278 P.2d 454].)

### THE JUDGMENT FOR MONEY HAD AND RECEIVED AS IT AFFECTS RAMAGES

We are of opinion that the judgment on the second cause of action, for money had and received, should be considered as operating with different effects upon the rights of the Ramages and Kirk.

A recovery of damages from the Ramages for the fraud might possibly be limited to the difference between the value of the note secured by trust deed and the money advanced by Bank. Instead, under the second cause of action Bank has a judgment against the Ramages for the full amount of the cash advanced.

No doubt it could be argued that because of the provision of the judgment that any amount recovered under the third cause of action should be a credit on the amount of the judgment on the second cause of action there could be no double recovery. However, under the decree of foreclosure the Ramages were liable to a deficiency judgment in the difference between the amount of the judgment and the fair value of the property at the time of the foreclosure sale. That value conceivably could be quite different from the value of the property received by Bank in reliance on the fraudulent representations at the time Bank received the note and trust deed. Hence, the Ramages, under the second cause of action, become liable to pay up to the amount of the deficiency judgment under the third cause of action instead of the amount of damages for fraud measured by the difference in value between the consideration parted with and the property received. Reflected in the amount of the deficiency judgment is an item of $12,500, attorney's fees, and a trustee's fee of $1,497.74, neither of which could be recovered except upon the provisions of the affirmed contract.

For that reason it cannot be said that as to the Ramages the judgment on the second cause of action in implied *assumpsit* did not impose a greater burden than would have a judgment for damages upon a cause of action based upon the tort.

The judgment of August 19 on the second cause of action is reversed in the following particulars only:

Insofar as it adjudges a recovery of money from either Ramage or Mrs. Ramage.

The judgment of August 19 on the third cause of action is modified by striking paragraph (e) thereof and by substituting therefor the following: "The amount of the judgment on plaintiff's second cause of action shall be credited with any

and all amounts credited against the judgment on plaintiff's third cause of action.''

The judgment of March 1 is reversed only insofar as it fixes the sum of $125,000 rather than $60,000 as the basic amount necessary to redeem.

In all other respects the judgments appealed from are affirmed. The cause is remanded to the trial court to correct said judgments in accordance with this opinion.

Each party shall bear its own costs on appeal.

Brown (Gerald), P. J., and Coughlin, J., concurred.

A petition for a rehearing was denied November 8, 1968, and the petition of defendants and appellants for a hearing by the Supreme Court was denied December 11, 1968.